| | | |
|---|---|---|
| MARK S. HERNANDEZ | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-CV-2054 |
| | ) | |
| WILLIAM RAINEY HARPER | ) | Judge Matthew F. Kennelly |
| COLLEGE, | ) | Magistrate Judge Arlander Keys |
| | ) | |
| Defendant. | ) | **JURY DEMAND** |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION[1]

Plaintiff, Mark S. Hernandez, was a one-year employee of the Defendant Harper College

("College"), where he served as head baseball coach and an adjunct faculty member.  He had no

record of any discipline against him by the College.  In fact, the only discipline he received

during his year of employment was an ejection from a game in which he was coaching, followed

by a one-game suspension based on that ejection.  Notably, the College's current coach, Cliff

Brown, also received an ejection and one-game suspension in April 2011.  Brown, who is a

white, non-Mexican, was not terminated.  Hernandez, of Mexican national origin, was

terminated.  That fact, by itself, precludes summary judgment in favor of the College.

Particularly when the Court considers that the College failed to disclose Brown's ejection and

suspension, well-aware that it would raise issues of material fact as to whether the College

---

[1] Hernandez refers to the Defendant's Statement of Facts ("SOF") as well as his response thereto
("Resp.") and his Statement of Additional Facts ("AFX").

treated Hernandez in a like manner to the way it treated Brown.

The pleadings, affidavits, declarations, depositions and evidence in this matter demonstrate the existence of numerous genuine issues of material fact that preclude the grant of summary judgment for Defendant.

**FACTS**

Many of the facts in this matter are not in dispute. In opposing the Motion for Summary Judgment, of course, Hernandez will focus on those facts that are in dispute versus the facts that Defendant's contend are not in dispute. The facts, disputed and undisputed, are set forth in the College's LR 56.1 Statement, Hernandez's Response thereto, and Hernandez's Statement of Additional Facts.

Defendant seeks summary judgment on all Counts of the Complaint. But, as set forth below, they are not entitled to summary judgment due to the existence of numerous disputed material facts.

In its Memorandum in Support of the Motion for Summary Judgment, Defendant includes discussion of a DUI and a criminal damage to property charge against Hernandez prior to his employment with the College. The Court should not lend any weight to those matters, as the College did not learn of those facts until discovery in this matter, well over two years after it terminated Hernandez. (SOF and Resp., ¶¶ 22-24.) And, being unaware of those facts at the time, the College did not cite those facts in its Personnel Action Notice terminating Hernandez's employment. (Defendant's Exhibit 39.)

The facts indicate that Hernandez submitted to a non-fingerprint background check in September 2007. That check apparently came back with a report that caused the College to require Hernandez to be fingerprinted. When Hernandez presented himself to be fingerprinted in

October 2007, he was told it was because Hernandez was a "common last name." (SOF and Resp. at ¶ 37.) Hernandez begrudgingly submitted to the fingerprinting and thought that was the end of it.

Six months later, however, the College advised Hernandez that it never received a report back from the Illinois State Police in response to Hernandez's fingerprints being submitted. Hernandez strenuously objected to being asked to submit a second set of fingerprints. He emailed the human resources department and protested. He discussed it with Spiwak, his supervisor, and other administrators. He reviewed the Adjunct Faculty Handbook. And could not find anywhere the requirement that he be fingerprinted once, much less twice.

The College stresses in its pleadings that the background check is vital to the safety of the environment at the College for students, faculty, and administrators. But that contention is contradicted by the undisputed fact that Hernandez was given the job in May 2007. He spent the summer of 2007 scouting and recruiting, *i.e.*, acting as the College's head baseball coach, at local baseball games involving 16-to-18 year old males. Even after he was fingerprinted in October 2007, the College did nothing to follow up on the supposedly all-important background check until April 2008 – six months later, and over three months into the Spring baseball season. If, as the College claims, the background check was so vital, it certainly would have exercised greater diligence in making sure that Hernandez was not a dangerous criminal. Instead, the College allowed him to complete the school year before finally running the LEADS background check on him on May 21, 2008. And even though that background check cleared him for employment (in the words of the College's Chief of Police), the College terminated his employment less than a week later.

The College also makes much of the fact that Hernandez was ejected from a baseball

game in April 2008. The College even saw fit to put in bold print the word **"fuck"** in its Memorandum of Law. (See College's Memorandum, pp. 2, 8.) Hernandez purportedly had used the word repeatedly in addressing an umpire who had warned his pitcher about inside pitches.

For better or for worse, college athletes are certainly used to such language, as are umpires and, presumably, athletic directors. By trying to make such a big deal of the word, well after the fact, the College gives lie to its real reason for terminating Hernandez – because he was Hispanic and because he objected to being asked to provide a second set of fingerprints.

Looking at the facts in the light most favorable to Hernandez, the Court must deny the Motion for Summary Judgment.

## ARGUMENT

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is *no* genuine issue as to *any* material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When considering a summary judgment motion, the court construes the facts and draws reasonable inferences in the light most favorable to the nonmoving party. *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004).

Here, Hernandez has demonstrated the existence of disputed issues of material facts that preclude a grant of summary judgment. Construing the facts and drawing reasonable inferences in favor of Hernandez, the Court should deny Defendant's Motion for Summary Judgment.

## A. Hernandez Exhausted His Administrative Remedies

The College claims that Hernandez failed to exhaust his administrative remedies because his amended charge was untimely in alleging retaliation. A review of the original and amended charges, however, demonstrates that the original charge adequately set forth a claim for retaliation and the later amendment was simply a housekeeping measure.

The original charge read, in part, that:

> On or about April 7, 2008 Respondent requested that I submit to a second finger print examination. I protested, as a result on May 27, 2008, my contract was not renewed, I was terminated.

Original Charge of Discrimination, Exhibit D to the Complaint in this matter and Exhibit 3 to Defendant's SOF. The Amended Charge read, in part:

> On or about April 7, 2008 Respondent requested that I submit to a second finger print examination. I protested and complained to Respondent of racial discrimination. Consequently, on May 27, 2008, my contract was not renewed and I was terminated.

Amended Charge of Discrimination, Exhibit A to the Complaint in this matter and Exhibit 5 to Defendant's SOF. Clearly, the original charge stated a claim of retaliation by stating, "I protested [and] as a result" I was terminated. On both Charges, Hernandez had checked the box indicating national origin discrimination. The Amended Charge simply added a check to the box labeled "Retaliation" and changed the language "as a result" to "consequently." In both cases, the College was certainly on notice that Hernandez was claiming that he was terminated, in part, because he complained of being required to provide a second set of fingerprints.

Unlike in the cases cited by Defendant, Hernandez's new charge did not add allegations of additional acts. It simply changed the wording. If Hernandez had not filed the amended charge, certainly his original charge stating, "I protested [and] as a result was terminated" would be sufficient to set forth a charge of retaliation.

The C.F.R. provision cited by Defendant (Memo, fn. 2) even provides that, "A charge may be amended to clarify and amplify allegations made therein." (29 C.F.R. § 1601.12.) That is precisely what Hernandez did here.

This case is readily distinguishable from the single Seventh Circuit case cited by Defendant. In *Fairchild v Forma Scientific, Inc.*, 147 F.3d 567 (7th Cir. 1998), the Seventh Circuit held that an original charge of age discrimination did not support an amended charge, filed over two years later, alleging disability discrimination. Clearly, the facts here are inapposite and there is no support for Defendant's position that Hernandez's amended charge was untimely. It merely clarified and amplified the allegations in the original charge and added no facts or allegations or new claims of discrimination.

**B.     Plaintiff Can Establish a *Prima Facie* Case
of National Origin Discrimination.**

The facts of this case are so in dispute that the Court cannot rule that there is no genuine issue of any material fact that would allow Hernandez to establish a *prima facie* case of national origin discrimination.

Hernandez submitted to the non-fingerprint background check without protest. When he was advised in September 2007 that he need to be fingerprinted, he asked "why." He was not told any specific reason other than that he had "a common last name" which had "triggered hits." His last name, Hernandez, is certainly common in the Mexican community. Although such Mexican names are not common at the College. Hernandez was understandably upset but acquiesced to the requirement that he submit fingerprints. And for six months he heard nothing more about the topic.

6

### 1. There is enough evidence to proceed under the direct-evidence method.

The officer who made the remark about Hernandez's "common name triggering marks" was not truly a "co-worker" of Hernandez. And Hernandez has no way of knowing the officer's exact identity. Certainly the College can determine what officer was on duty on October 1, 2007, when Hernandez presented himself to be fingerprinted. But the College has not done so. Notably, the College does not, and cannot, dispute that the conversation occurred. The conversation itself is a material fact that precludes the grant of summary judgment.

Additionally, the officer was charged with enforcing the College's rules and regulations, including the requirement that Hernandez be fingerprinted. This was not, as the College maintains, the mere "stray remark" of co-worker. It was the remark of a law enforcement employee, employed by the College, who told Hernandez why he needed to be fingerprinted.

The Court must keep in mind that the Harper College Police Department is not a large police force. The College could easily find out (or could have if it had done so in a more timely fashion) what officers were on duty at what times on October 1, 2007. Armed with that information, Hernandez could likely identify who made the statement. But the College should not be rewarded for its failure, refusal or inability to provide a list of the officers who were on duty that day. The College was able to obtain affidavits from many other current and former College employees when those affidavits served the College's purposes. But the College's failure to identify even a list of people on the duty roster for October 1, 2007, hampers Hernandez's ability to specifically identify the individual who made the comment and get from that person an admission (or even a denial) that the individual made the comment.

Further, this was not a stray ethnic slur or other comment by an uninformed person – it was an explanation by a police officer as to why Hernandez needed to be fingerprinted.

While this may not be the strongest direct-evidence case this Court has addressed, there is certainly enough of an issue of material fact to preclude the Court granting summary judgment to the College on this basis.

### 2. Hernandez has certainly demonstrated the ability to prevail on the indirect method.

Even if the Court were to find that there is no genuine issue of material fact under the direct-method analysis, the facts before the Court certainly weigh heavily against granting summary judgment under an indirect-method analysis. The College concedes in its Memorandum that Plaintiff was (and is) a member of a protected class (his national origin is Mexican). The College disputes that Hernandez was performing his job satisfactorily, was subjected to an adverse employment action, and was treated differently than other similarly situated non-Mexican employees. There are questions of fact on all of those issues.

### a. Plaintiff was performing his job satisfactorily.

Plaintiff was performing his job in a satisfactory manner as evidence by Spiwak's repeated praise for the job he was doing as late as May 22, 2008, the date of the Spring Sports Banquet. (AFX ¶ 35-36.) The College's contention that Hernandez's conduct was unacceptable when he was ejected from a game and suspended is hardly believable given that the current coach was likewise ejected and suspended in April 2011 but was retained as the baseball coach. The fact that Hernandez used the word "fuck," even repeatedly, is of no importance. If it were such an offensive word, why does the College see fit to put it in bold every time it uses it in the pleadings?

As for permitting a player to drive a vehicle onto the field, it is not as though he did so for enjoyment's sake. Hernandez was trying to do his job by making sure that a scheduled game took place on a safe, playable surface. The person with primary responsibility for the field could

not be located, so Hernandez took it upon himself to take action to get the field ready. There is

NO allegation or contention that the actions of Hernandez or the player did any damage to the

field. In fact, without their actions, the game would have been postponed. Granted, maybe

Geary was "upset" that someone else prepared the field. (SOF and Resp. ¶ 57.) But Hernandez,

his players, the fans, and the opposing team from Rock Valley would have been more upset if the

game had been postponed. (AFX ¶ 24.)

Finally, it is incredible that Spiwak loved Hernandez's coaching and recruiting

philosophy so much in May 2007 when he hired him but no longer liked it in May 2008 when he

terminated him. Especially when the email that Hernandez sent after the interview and the

actions he took as coach were essentially equivalent to the "philosophy" espoused by the current

coach on the team's website. (AFX ¶¶ 26, 27 and 34.)

The true evidence here is that at no time during Hernandez's tenure did Spiwak see fit to

communicate with him about any of his conduct or philosophy or treatment of players until

Hernandez protested in April 2008 about being required to provide a second set of fingerprints.

Even then, Spiwak could only cite "vibes" and "feelings" he got from the staff. Such subjective

"observations," never communicated to Hernandez, do not establish that Hernandez was not

performing his job in a satisfactory manner.

> **b.      Hernandez was subjected to an adverse employment action.**

The College further maintains that requiring a background check does not constitute an

adverse employment action. The College concedes, however, that the termination or

Hernandez's employment does constitute an adverse employment action.

What the College seems to miss is the relationship between the two. The College has not

pointed to anyone else who was twice required to be fingerprinted. And Hernandez's protest

over the second requirement led directly to his termination.

The College claims it was simply following its own procedures. But it did so in a selective manner that had an adverse impact on Hernandez. It allowed him to spend the entire summer of 2007 without undergoing *any* background check. And it failed to follow up on his fingerprints for over six months. Clearly, the policy was not a priority for the College and was enforced in a way that adversely affected Hernandez.

In the end, Hernandez was fired. Clearly, he suffered an adverse employment action.

### c. Hernandez was treated less favorably than similarly-situated employees.

Rarely does a case present such a similarly-situated employee as a person who holds the identical position that was held by a plaintiff. Here, Hernandez was the head baseball coach. He was ejected from a game and suspended for another game in April 2008. The next month, the College terminated him.

Three years later, Coach Brown was ejected and suspended in April 2011. Not only did the College not terminate him, the College did not see fit to even update its discovery responses to indicate that Coach Brown had been ejected and suspended.

Both Hernandez and Brown were the head baseball coach at the College. Both were ejected from a game and suspended from a subsequent game. Clearly, they are similarly-situated, and Brown (non-Mexican) was treated more favorably than Hernandez because Brown still has the head coach job at the College.

Remarkably, although Brown's ejection and suspension occurred in April 2011, and the College filed its Motion on May 2, 2011, the College claims that Hernandez "has not identified a single non-Hispanic employee who engaged in the same or similar conduct as he did, but was treated more favorably." (Def's Memo at p. 12.) Well, perhaps to the College's surprise,

Hernandez has now identified Coach Brown as someone who is non-Hispanic (and non-Mexican), who, like Hernandez, was ejected from a game by an umpire and who was then suspended. (AFX ¶ 28.) Unlike Hernandez, however, Brown also had a player ejected from a game, which never happened to Hernandez while he was at Harper. (AFX ¶¶ 29-30.) Yet Brown, unlike Hernandez, remains employed by Harper College.

One cannot imagine a more similarly-situated employee and based on that fact, the Court must find that Hernandez was treated less favorably and has established all the elements of a *prima facie* case of discrimination. The Court should deny the College's Motion and, further, ask itself, or the College, why Brown's ejection and suspension were never disclosed.

### C.     Herndandez can certainly establish a *prima facie* case of retaliation.

In order to demonstrate a prima facie case of retaliation, Hernandez must establish that engaged in protected activity, he suffered an adverse employment action, and there is a causal link between the protected activity and the adverse action. *Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2004).

### 1.     Hernandez engaged in protected activity.

First, Hernandez clearly engaged in protected activity. Within two days of being told that he had to submit a second set of fingerprints, he sent an email protesting that requirement and pointing out the "racialist justification" for it. (SOF and Resp. ¶ 37.) The College, to its credit, does not appear to argue that the April 9 email was not a protected expression.

### 2.     Hernandez suffered an adverse employment action.

Second, Hernandez was terminated at the end of May 2008. Clearly, that termination was an adverse employment action. Between the April 9 email and the May 27 termination, however, Hernandez was also subject to Spiwak's vague comments, based on "vibes" and

"feelings," about Hernandez's purported treatment of other employees. (SOF and Resp. ¶ 58 and 62.) He was also chastised for attempting to prepare the baseball field for a scheduled game, and the individual responsible for preparing the field, who had not done so, was allowed to get away with not having done his job that day. (AFX ¶¶ 18-24.)

### 3. Hernandez can establish a causal connection between his protest and his termination.

To demonstrate that there was a causal connection between the protected expression and the adverse employment action, Hernandez need only present "some evidence or retaliatory motive." *Burks v. Wisconsin Dep't of Transportation*, 464 F.3d 744, 751 (7th Cir. 2006). Here, Hernandez presents the unrefutable evidence that, prior to his April 9 email, he had NEVER been warned, counseled, chastised, or even given a clue that Spiwak was unhappy with his performance or that anyone else had complained to Spiwak about his conduct, behavior, or treatment of other employees or athletes. Even at his deposition, Spiwak could not point to a single specific instance of someone complaining about Hernandez either before or after the April 9 email. Instead, Spiwak cited the "vibes" and "feelings" that he got from the staff. (SOF and Resp. ¶¶ 58, 62.) The two specific incidents (Hernandez's ejection/suspension and the field-maintenance issue) occurred after that April 9 email. But there is certainly a question of fact as to whether Spiwak responded more harshly toward Hernandez as a result of those incidents because of his April 9 email.

To say, as the College does, that the record is "devoid of evidence" from which the Court could infer a retaliatory motive is simply incredible, and turns the summary judgment standard on its head. The Court is supposed to draw all reasonable inferences in favor of the non-moving party. Here, we have a protected expression on April 9. Almost immediately, Spiwak initiates a pattern of suddenly getting "vibes" and "feelings" which he had never gotten or expressed

before. And within 7 weeks, he terminates Hernandez.

Perhaps if Coach Brown had not been ejected and suspended, and had one of his players ejected from a game as well, yet kept his job, the Court could infer an innocent motivation by Spiwak in his termination of Hernandez. But in light of the remarkable similarity and timing (April of 2008 and April of 2011) of Hernandez's supposed egregious conduct and Brown's similar conduct, the Court simply cannot infer that Spiwak's decision to terminate Hernandez was unrelated to his April 9 email.

The College points out that Hernandez was cleared for employment a mere week before Spiwak terminated him. But it defies logic to ask the Court to then infer that the protest must have been unrelated. Rather, it is much more reasonable to infer that Spiwak insisted on the second fingerprinting (or, as it turned out, the LEADS background check) in the hope that there would be some information that would allow him to terminate Hernandez. Otherwise, if, as the College claims, Spiwak decided to terminate Hernandez based on the April ejection/suspension and the field maintenance issue (not to mention the "vibes" and "feelings"), why would Spiwak and the College have persisted in requiring the more in-depth background check? Put another way, if Spiwak was going to fire Hernandez anyway, why go through the bother of the background check?

The answer, again, is that Spiwak hoped the background check would provide him with a reason to terminate Hernandez. When it did not, he proceeded to terminate him anyway. Because he had made up his mind after Hernandez's April 9 email that he would not be back to coach the next year.

As demonstrated above, Hernandez was performing his job in a satisfactory manner. That is, he received no information to the contrary until after his April 9 email. (AFX, ¶¶ 1, 25,

35, 36.)  And the disparity between how he was treated following his ejection/suspension and how Coach Brown was treated following his ejection/suspension is glaring.

>    **D.  The College provides no legitimate, non-discriminatory reason for its termination of Hernandez.**

The College maintains that it has legitimate, non-discriminatory reasons for its actions. First, for the background check, the College insists it was simply enforcing its policy.  Yet the College has not even attempted to identify the person who told Hernandez that his "common name triggered markers" in October 2007.  Nor can the College explain why, despite the seeming importance of the background check, it allowed six months to pass before it noticed that Hernandez had not been cleared for employment.  And barely a week after he was cleared for employment, he was terminated anyway.

As for the termination, other than the ejection/suspension (for which Coach Brown was not terminated) and the field maintenance issue with Geary (which, frankly, was due to Geary not getting the field ready and Hernandez taking the initiative to get the field ready), Spiwak points to no concrete facts or complaints from others that led him to terminate Hernandez.  He relies on "vibes" and "feelings" and the ejection/suspension of Hernandez in April 2008.  Again, not until after Hernandez's April 9 email did Spiwak start relaying these vague "complaints" to Hernandez and ask him to "foster a more positive relationship."  Without anything concrete or subjective to point to, it is not sufficient for Spiwak and the College to rely on "vibes" and "feelings" and expect the Court to remove this case from the province of a jury.  There are simply too many genuine issues of material fact for the Court to seriously consider granting summary judgment.

Whether or not Spiwak is lying is something that a jury should be allowed to determine. It is instructive that no warnings were placed in Hernandez's personnel file, no disciplinary

action was taken by the College, and, importantly, Coach Brown remains employed despite also being ejected and suspended. All of these facts give rise to a strong, and certainly reasonable, inference that Spiwak's stated reasons are simply untrue.

Finally, the College makes a short reference on pages 18 and 19 of its Memorandum that summary judgment is appropriate because Spiwak hired Hernandez and also fired him. But there is a question of fact as to why. In the fall of 2007, the College was going through an accreditation process. During that period, Spiwak encouraged Hernandez to apply for full-time positions because it would look good for the College to have an Hispanic presence on the full-time staff. (AFX ¶ 40.) Hernandez applied for a number of positions, to no avail. Spiwak also suggested that Hernandez assist Jim Ryan in his work in anticipation of taking over his job when Ryan retired. (*Id.*) By the end of the 2007-08 school year, Spiwak's (and the College's) motivation for hiring and retaining Hernandez had disappeared. And, of course, on April 9, 2008, Hernandez had sent his email protesting the requirement that he be fingerprinted a second time.

Perhaps the biggest issue facing the College is why Coach Brown was not terminated even though he was ejected from a game and suspended and, unlike Hernandez, he even had a player ejected from a game. Additionally, it raises questions of forthrightness and credibility that the College failed to disclose those facts even though they occurred prior to the College filing its Motion for summary judgment.

IV.    **CONCLUSION**

Based on all of the foregoing, Hernandez respectfully submits that there are genuine issues of material fact that preclude the grant of summary judgment in favor of Defendant. The Court should deny Defendant's Motion for Summary Judgment and grant such other and further

relief as this Court deems appropriate.


July 8, 2011                                    Respectfully Submitted,

                                                Mark S. Hernandez


                        By:        s/ John J. Lynch                    _
                                   John J. Lynch


John J. Lynch
Attorney at Law
4018 N. Lincoln Avenue
Chicago, Illinois 60618
Ph:  (312) 380-6553
IL ARDC No. 6225509