IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **MARK S. HERNANDEZ,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 10 C 2054** |
| ) | |
| **WILLIAM RAINEY HARPER COLLEGE,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Mark Hernandez has sued his former employer, William Rainey Harper College
("Harper"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(1).
Hernandez claims that Harper discriminated against him because of his Mexican
national origin (Count 1) and retaliated against him after he complained about this
alleged discrimination (Count 2).[1]  Harper has moved for summary judgment.  For the
reasons stated below, the Court grants the motion.

### Facts

On a motion for summary judgment, the Court views the facts in the light most
favorable to the non-moving party and draws reasonable inferences in that party's
favor.  *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011).  The following facts are
taken from the parties' memoranda of law and statements of uncontested facts.

---

[1] Hernandez previously withdrew with prejudice Counts 3 through 6 of his
complaint.  *See* Order of Apr. 25, 2011.

Harper is a community college located in Palatine, Illinois. Hernandez worked at Harper as an adjunct faculty member and head baseball coach during the 2007-08 school year. Douglas Spiwak, Harper's Director of Athletics and Fitness, interviewed Hernandez and recommended him for hire in May 2007. Hernandez began scouting and recruiting players during the summer of 2007, but he was not working under an employment contract at that point.

## A. Background check

Harper policy requires new hires to submit to a criminal background check. The first phase of this check involves a "Waiver for Non-Fingerprint Conviction Information Records Check" form, which asks new hires for their full name, date of birth, sex, social security number, and driver's license number. Harper's police department then submits the information to the Illinois State Police office, which generates a "Statewide Records Search document." Harper policy dictates that if the records search returns a "conviction hit," the new hire must submit fingerprints for a further background check.

Hernandez completed the non-fingerprint form in September 2007. The ensuing records search returned a result indicating one or more conviction hits. Spiwak then informed Hernandez that he needed to undergo a fingerprint check. Hernandez agreed and went to the campus police office on October 2, 2007. Hernandez testified that when he did so, he asked an officer why he needed to be fingerprinted. The officer responded that Hernandez's "name had triggered markers within their system." Hernandez Dep. 91:20-21. Hernandez then submitted his fingerprints.

On April 7, 2008, a member of Harper's human resources staff sent the following e-mail to Hernandez:

After much communication with Harper police, it has come to my attention that the results of the background check for Mark Hernandez were never received. Unfortunately, the person to normally handle background checks for HPD has been out of the office on and off for awhile. I spoke today with Nan who has tried to retrieve the results from the original finger printing. The results are only kept by the state for 30 days and we are long past that time frame. At this point, we have been asked to submit a new set of finger prints. This will require Mr. Hernandez to return to HPD for new prints to be taken.

I apologize for the inconvenience to Mark. This is a requirement of employment however, so we must redo the background check.

Def. Ex. 23.[2] Hernandez replied on April 9, 2008, copying Spiwak:

I have addressed this disturbing issue regarding a demand for finger prints with my Physical Education Department Co-chair Sue Overland. I am disheartened to learn that my initial set of fingerprints was mishandled by the Harper Police Department. In my discussion with Sue Overland, I was made aware of the fact that in the Harper College Instructional/Teaching Adjunct Faculty Handbook that an Adjunct Instructor is not required to be fingerprinted.

I was taken aback, appalled, and sickened when initially ordered to be finger printed as a requirement for employment during the Fall 2007 semester. While addressing the initial finger print demand at the Harper police department, I was not satisfied with the racialist justification of having a "common name" that triggered markers as a reason too violate my confidence, drive, and morale. As a successful minority Adjunct Instructor, I discussed with Sue Overland my resentment of the intimidating implication, narrow-mindedness, and discrimination for the initial and current claim, requirement, and demand for fingerprints.

I have been in an athletic leadership role as a Head Baseball Coach, as well as, an Adjunct Instructor capacity at Harper College since the Fall 2007 semester. I have previously worked in college environments and have never been asked to be finger printed because of my name. I was and remain deeply offended, embarrassed, and humiliated by the demand of taking fingerprints. I am now feeling intimidated again because of another demand for a second set of finger prints due to internal incompetence. I do not accommodate ineptitude and decline taking a second demand of finger prints until seeking legal consultation.

Def. Ex. 24.

---

[2]All e-mails and other written statements referenced in the Court's opinion are quoted verbatim.

On May 21, 2008, Hernandez returned to the college police department for a second fingerprinting and a meeting with Harper's chief of police. Before or during this meeting, however, the chief accessed a separate background-data system and determined that the conviction hits from the non-fingerprint background check were for someone other than Hernandez. The meeting therefore cleared Hernandez for continued employment. He was not required to submit a second set of fingerprints and did not do so.

**B.    Hernandez's employment at Harper College**

Hernandez's responsibilities as head baseball coach included "scheduling games, recruiting in-district athletes, supervising all baseball practices and games, submitting statistics, and coordinating all aspects of the baseball program with the Athletic Director." Def.'s L.R. 56.1 Stmt. ¶ 51. He was also required to abide by the National Junior College Athletic Association ("NJCAA") Rules and Regulations and Code of Conduct.

In April 2008, before a home baseball game, Hernandez allowed one of his players to drive an SUV onto the baseball field dragging a device that was intended to prepare the field for play. Hernandez was not told before this that he could take such an action or that he was specifically forbidden from doing so. Hernandez claims that Richard Geary, the Harper buildings and grounds employee who was responsible for field maintenance, had failed to prepare the field properly and that Hernandez had to "groom" the field to render it safe for play. The game started late because of the time taken up by field preparation, and officials eventually halted it due to darkness. Hernandez's action upset Geary. Spiwak later informed Hernandez of this and asked

Hernandez not to have any further contact with Geary.

At a baseball game on April 14, 2008, Hernandez had a series of disagreements with the umpire. Hernandez entered the field during the game and asked the umpire, "What the fuck are you doing?", told the umpire that something was "fucking awful" and that the umpire did not "know what the fuck my pitcher is thinking," and asked, "How the fuck can you give a warning for that?" Hernandez Dep. 188:2-189:6. Hernandez refused to comply with the umpire's request that he return to his dugout. The umpire then ejected Hernandez from the game, and the NJCAA issued an automatic one-game suspension pursuant to its rules. Spiwak thereafter warned Hernandez that he would not tolerate such conduct. No other Harper coaches were ejected from a game or suspended during the 2007-08 school year. However, Harper's current baseball coach was ejected and received a one-game suspension after arguing a call with the umpire in April 2011.

Spiwak says that he received "informal complaints from Athletic Department staff, including [his] assistant Cheryl LaRocca, that Hernandez was arrogant and rude when discussing business matters with them." Def. Ex. 16 ¶ 13. Spiwak also says that he received "informal complaints . . . from several baseball players that Hernandez was preferential to his recruits and did not provide a balanced learning experience for returning players." *Id.* ¶ 19. Spiwak informed Hernandez that he had received complaints. Hernandez does not expressly deny these allegations, but he claims that he was not told of any problems until after he sent the April 9 e-mail objecting to a second fingerprinting and that Spiwak has not identified any complainants or stated specifically what they said.

In an April 15, 2008 e-mail conversation on which Spiwak was copied, a Harper athletics employee responsible for the website asked Hernandez for recaps of the baseball games his team had played. Hernandez's response stated in part,

> I am going to pass on the game recaps. Too many requests for additional peripheral things that will not benefit our student-athletes, other than my communication to four year programs. . . . Not enough time in the day and if a game recap is not completed correctly to my standards, I do not want it done at all.

Def. Ex. 36. In response to the employee's suggestion that the players "like some recognition," Hernandez wrote, in part,

> My experience with the website is that it has attracted the wrong type of student-athlete . . . . I do not have one player in my program from the effort of the website and work too hard to invest additional time. I do not want or need soft paper champions looking for a pat on the back in my program.

*Id*.

In a separate e-mail exchange that same day, Hernandez forwarded Spiwak an message from a vendor who had not been paid for an order and wrote that the "lack of communication and ownership of an issue at Harper is not an acceptable business practice with a valued vendor." Def. Ex. 37. Spiwak replied,

> I find it alarming when you are quick to comment on our business practices. . . . This is your first year as a head coach. It would serve you well to exercise more patience and tolerance. We all want to see you be successful, but it makes it very difficult for the staff if you come at them in a angry and judgemental manner. You may not intend to come off this way, but that is the impression I am getting from your recent emails. . . . I truly appreciate all that you have done. I have continued to support your requests for more opportunities at Harper as well. But I can only continue to do so if you continue to foster a positive working relationship with the rest of the faculty and staff.

*Id*. Hernandez replied, in part,

> Thanks for your message. . . . My tone is direct and to the point, because I am direct and to the point while in the middle of a baseball season facing many time

constraints.  I can not give explanation for thin skinned reactions by others not affiliated within a highly competitive athletic department.

*Id*.

On May 27, 2008, Spiwak filed a "Personnel Action Notice" of Hernandez's termination.  The notice stated that Hernandez's "contract will not be renewed for 2009" and included the comment:  "Poor interpersonal communication with college employees and student athletes."  Def. Ex. 39.

On March 19, 2009, Hernandez filed a charge with the EEOC through the Illinois Department of Human Rights.  He checked the box provided on the form for discrimination based on national origin and wrote,

> I was hired on May 18, 2007 by Respondent.  My most current position was Adjunct Faculty and Head Baseball Coach.  On or about October 1, 2007 Respondent requested that I submitted to finger prints as a condition of my employment no one other staff was subjected to fingerprinting.  On or about April 7, 2008 Respondent requested that I submit to a second finger print examination.  I protested, as a result on May 27, 2008 my contact was not renewed, I was terminated.  I believe I have been discriminated against because of my national origin, Hispanic, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Def. Ex. 3.  On November 6, 2009, Hernandez filed an amended charge.  On this charge, he checked the boxes for retaliation and for discrimination based on national origin.  He also changed the penultimate sentence of his charge to read, "I protested and complained to Respondent of racial discrimination.  Consequently, on May 27, 2008, my contact was not renewed and I was terminated."  Def. Ex. 5.  After the EEOC issued Hernandez a right to sue letter, he filed this lawsuit.

## Discussion

Summary judgment is proper when the moving party shows that there is no

genuine dispute over any material fact and that they are entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when,

based on the record, a reasonable fact finder could find in favor of the nonmoving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The Court views the record

and draws all reasonable inferences in the light most favorable to the nonmoving party.

*Outlaw v. Newkirk*, 259 F.3d 833, 836-837 (7th Cir. 2001).

## I.       Discrimination claims

## A.       Background check

Hernandez claims that he was asked to submit fingerprints solely based on his

last name, which he equates with a request based on his national origin.  He argues

that the initial and subsequent requests for fingerprints, along with the second

background check that Harper performed, therefore constituted prohibited

discrimination.

A Title VII plaintiff may show that he suffered discrimination under either the

direct or indirect method of proof, which the Court explains further below.  Both

methods, however, require the plaintiff to prove that he suffered an "adverse

employment action."  *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 849-50 (7th

Cir. 2008).

To show adverse action, an "employee must be able to show a quantitative or

qualitative change in the terms or conditions of employment."  *Haywood v. Lucent

Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003).  The court in *Haywood* found that the

plaintiff had failed to make this showing regarding an employer's delay in processing

her transfer request.  Although the plaintiff had experienced "uncertainty" that was "unpleasant," her "duties, responsibilities, compensation, and benefits remained the same," and she did not "allege that the delay affected her opportunities . . . or otherwise injured her career." *Id*.

The Seventh Circuit has not considered whether a background check qualifies as an adverse employment action, but courts that have done so have found that it does not, because it causes no change in the circumstances of employment.  *See, e.g.*, *Catanzaro v. City of New York*, No. 10 C 1825, 2011 WL 335648, at *6 (S.D.N.Y. Jan. 25, 2011) (finding that background check was "no more than an inconvenience"); *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1368 n.13 (M.D. Fla. 2001).

In *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997 (7th Cir. 2000), the Seventh Circuit considered whether a required drug test could qualify as an adverse employment action.  The court noted that such a test might qualify "under circumstances where a drug test is not performed in a routine fashion following the regular and legitimate practices of the employer, but is conducted in a manner that harasses or humiliates employees."  *Id*. at 1001-02.  The test in that case was not an adverse action, however, because, after receiving reliable information that the plaintiff was using drugs, the employer made a "reasonable and legitimate request . . . pursuant to [its] published Drug Policy."  *Id*. at 1002.  The court similarly found that an independent medical examination required of an employee returning to work was not an adverse employment action because it was a regularly required procedure and "the

evidence [did] not support the inference that [the plaintiff] was being singled out." *Place v. Abbot Labs.*, 215 F.3d 803, 809 (7th Cir. 2000).

The Court concludes that the background checks at issue in this case share relevant characteristics with the required drug tests and medical examinations addressed in *Stockett* and *Place* and therefore adopts the analysis from these cases. Hernandez concedes that Harper's written policy states that any new employee whose name returns conviction hits must undergo a fingerprint check. Hernandez claims that he nonetheless felt harassed by the fingerprint request, and the Court must draw reasonable inferences in his favor. There is no evidence, however, that Harper did anything other than follow this policy. Hernandez admits that his name returned conviction hits; that both before and after 2007-08 Harper has required other employees whose initial background checks returned conviction hits to submit fingerprints; and that he has no information that there was any employee whose initial check returned a conviction hit who was not required to submit fingerprints. In the face of this evidence, no reasonable jury could find that the fingerprinting was "conducted in a manner that harasse[d] or humiliate[d] employees." *See Stockett*, 221 F.3d at 1001-02.

Hernandez further argues that Harper's failure to follow up on his first fingerprint check shows that the college did not properly follow its own procedures, undercutting the notion that it requires fully completed background checks before allowing an employee to begin work. Hernandez does not identify, however, any evidence supporting the view that this failure or the second request for fingerprints constituted harassment or humiliation or led to anything other than the sort of delay that the court in

*Haywood* found did not give rise to a viable claim. The tone and substance of the April 7, 2008 human-resources e-mail requesting Hernandez's second set of fingerprints do not support this view either.

In sum, there is no evidence from which a reasonable jury could conclude that any aspect of the background-check process changed the circumstances of Hernandez's employment, inappropriately singled him out, or occurred for any reason other than Harper following, albeit imperfectly, its new-hire policy. For these reasons, the Court concludes that Hernandez's background check was not an adverse employment action and cannot support a Title VII discrimination claim.

**B.    Termination**

   **1.    Direct evidence**

Hernandez also alleges that he was terminated based on his national origin. He does not appear to contend that he has direct evidence that the termination itself was discriminatory. In the direct-evidence portion of his brief, Hernandez argues instead that the Harper police officer's comment about Hernandez's surname constitutes direct evidence that the fingerprinting was discriminatory. As the Court has explained, Hernandez cannot show that the fingerprinting itself is actionable under Title VII. Because Hernandez also contends, however, that the Court should consider the connections between the fingerprint requests and Hernandez's termination – essentially examining the two events as a single adverse action – the Court finds that there is no direct evidence that the termination was discriminatory even if it is considered along with the fingerprint requests.

Direct evidence is "evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997). Hernandez believes that Harper requested his fingerprints because of his name – that is, because it appeared to indicate Hispanic national origin – not because his name returned conviction hits in the initial records search. In his brief, Hernandez makes much of the fact that he was supposedly told that he had to provide fingerprints because he had a "common" last name. He infers from this that someone at Harper determined that a person with a Hispanic-sounding surname must undergo fingerprinting. The only source of evidence for the purported use of the word "common," however, is Hernandez's e-mail of April 9, 2008. When he testified under oath about the conversation, Hernandez said only that the officer told him his "name had triggered markers within their system." Hernandez Dep. 91:20-21.

Even if the officer taking Hernandez's fingerprints actually stated that Hernandez had a common last name, there is no evidence from which a reasonable jury could infer that the officer's comment was anything other than an explanation that a common name is more likely to return conviction hits than an uncommon name. The officer's comment would not enable a reasonable jury to find a discriminatory animus for the fingerprinting. For the same reasons, the comment cannot serve as evidence of a discriminatory purpose for Hernandez's termination. Hernandez does not offer any other purported direct evidence of discrimination.

Even if the officer's comment were appropriately considered, Hernandez cannot show that the officer was a person whose statements can provide direct evidence of

12

discrimination. Under the direct method of proof, "allegedly discriminatory statements are relevant . . . only if they are both made by a decisionmaker and related to the employment decision at issue." *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 688 (7th Cir. 1998). Hernandez offers no evidence from which a reasonable jury could find that the officer was responsible for the decision to take fingerprints, much less the decision to terminate his employment.[3] In addition, the officer's "isolated . . . comments were not contemporaneous with the discharge or causally related to the discharge decision making process [and are therefore] insufficient to create a triable issue of material fact" regarding national-origin discrimination. *See Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000) (internal quotations and citation omitted). The Court concludes that Hernandez has presented no direct evidence that his termination was discriminatory.

**2.      Indirect evidence**

Because Hernandez has not shown any direct evidence of discrimination based on his national origin, he must prove his claim through the burden-shifting method that the Supreme Court established in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973).

Under the *McDonnell Douglas* approach, Hernandez may establish a *prima facie* case of discrimination by showing that he is a member of a protected class; was

---

[3]Hernandez argues that he "has no way of knowing the officer's exact identity" because of Harper's "failure, refusal or inability" to indicate which officers were on duty on the date in question. Pl.'s Resp. at 7. Harper's reply, however, states that Hernandez sought no discovery on this issue, and Hernandez's brief does not state otherwise.

performing his job satisfactorily; suffered an adverse employment action; and similarly-situated employees outside of his protected class were treated more favorably. *Antonetti v. Abbott Labs.,* 563 F.3d 587, 591 (7th Cir. 2009); *Goodwin v. Bd. of Trs. of the Univ. of Ill.*, 442 F.3d 611, 617 (7th Cir. 2006). The burden then shifts to Harper to provide a legitimate, nondiscriminatory reason for the actions claimed to be discriminatory. *McDonnell Douglas Corp.*, 411 U.S. at 802. If Harper does this, Hernandez must then prove that Harper's stated reasons were a pretext for discrimination. *Id.* at 804; *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 559 n.2 (7th Cir. 2004).

A court "may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision." *Adelman-Reyes v. St. Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007). Harper contends that Spiwak chose not to renew Hernandez's contract for six reasons:

> (1) that Plaintiff allowed a student to drive an unauthorized vehicle onto the baseball field without permission; (2) the complaints made by athletic department staff about Plaintiff's demeanor and the need for Plaintiff needed [sic] to foster a more positive relationship with College staff; (3) the complaints made by returning baseball players about Plaintiff not treating them fairly; (4) that Plaintiff's coaching and recruiting philosophies conflicted with that of the College; (5) that Plaintiff's conduct during the April 14, 2008 baseball game, his ejection, and subsequent suspension would not be tolerated by the College; and (6) that Plaintiff demonstrated poor communication with others.

Pl.'s Mem. at 18. Because Harper has offered a nondiscriminatory explanation for its employment decision, the Court proceeds to assess whether Hernandez can show the explanation is pretextual.

"Pretext means a dishonest explanation, a lie rather than an oddity or an error."

14

*Everroad v. Scott Trucking Sys., Inc.*, 604 F.3d 471, 479 (7th Cir. 2010) (internal

quotation marks and citation omitted). The fact that a plaintiff must show that the

employer's given reason for the challenged action was a pretext for discrimination does

not mean that the plaintiff

> ha[s] to provide direct evidence of a discriminatory motive[,] as such a
> burden would deflate the significance of the *McDonnell Douglas* indirect
> method. But [he] must create at least an inference of illegal
> discrimination. A plaintiff's prima facie case, combined with sufficient
> evidence to find that the employer's asserted justification is false, may
> permit though it does not require the trier of fact to conclude that the
> employer unlawfully discriminated. However, that is not always the case,
> as when a plaintiff is able to prove that the employer's stated reason is
> false, but in so doing, makes clear that the true reason was not illegal
> discrimination. For example, a plaintiff who claimed he was fired because
> of age discrimination defeated his own case when, in the course of
> proving that his employer's stated reason was false, he presented
> evidence that the true reason he was fired was because his firm was
> trying to cover up SEC rules violations that he had discovered.

*Greene v. Potter*, 557 F.3d 765, 769 (7th Cir. 2009) (internal quotations marks and

citations omitted) (citing, among other cases, *Reeves v. Sanderson Plumbing Prods.,

Inc.*, 530 U.S. 133, 148 (2000)). To put it another way, a plaintiff does not have to

prove "pretext plus." *See, e.g., Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1045 (7th

Cir. 1999).

The Seventh Circuit has stated that an employee may prove pretext by showing

that "(1) the employer's stated reason has no basis in fact; (2) although based on fact,

the stated reason was not the actual reason for discharge; or (3) the stated reason was

insufficient to warrant the discharge." *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554,

561 (7th Cir. 2011). No reasonable jury could find that Hernandez has made these of

these showings regarding Harper's stated reasons for terminating him.

Hernandez's main contention is that his ejection from the April 14, 2008 baseball game cannot have been one of the actual reasons for his termination. In this regard, Hernandez relies on the fact that Harper's current baseball coach was also ejected and suspended in 2011 but has not been terminated. Hernandez contends that the current coach is a similarly situated non-Hispanic employee who was treated better than Hernandez.

Similarly situated "comparators must be similar enough that any differences in their treatment cannot be attributed to other variables." *Silverman v. Bd. of Educ. of Chi.*, 637 F.3d 729, 742 (7th Cir. 2011). Harper argues first that the two coaches are distinguishable because Hernandez was ejected for the use of profanity, whereas the current coach was ejected for arguing a call with the umpire. A reasonable jury could find that this is "a distinction without much difference." *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 406 (7th Cir. 2007). Because both coaches were ejected from a game based on a conflict with an umpire, there are "sufficient commonalities on the key variables" to enable a jury to "isolate the critical independent variable" of national origin in this comparison. *Id*. at 405–06.

Harper also points out, however, that the ejection and suspension was just one of several reasons for Spiwak's decision. Hernandez does not argue that the current coach engaged in any of the other actions that Spiwak attributes to Hernandez. Under the circumstances, no reasonable jury could find that the two coaches were similarly situated. *See Eaton v. Ind. Dep't of Corr.*, _ F.3d _, No. 10-3214, 2011 WL 3966145, at *7 (7th Cir. Sept. 9, 2011) (indicating that differences in disciplinary history render

employees non-comparable if the employer took disciplinary history into account in the challenged decision). Harper's treatment of the current coach therefore does not support Hernandez's argument that his own ejection was not truly a reason for his termination.

Hernandez also disputes that Spiwak received complaints about him from staff and players. He admits, however, that Geary, the buildings and grounds employee, was upset after Hernandez allowed a student to drive on the field and that Spiwak discussed Geary's complaint with him. Pl.'s Resp. to Def.'s L.R. 56.1 Stmt. ¶¶ 57, 60. Spiwak's affidavit also specifically references his assistant as having complained about Hernandez. Hernandez has not presented any evidence that contradicts Spiwak's contentions that the two named employees made complaints or that those complaints factored into his decision. Nor does Hernandez's contention that several of his former students followed him to his subsequent coaching job constitute evidence from which a reasonable jury could find that Spiwak's claims that some students made complaints were untrue.

"[N]either presenting a scintilla of evidence, nor the mere existence of some alleged factual dispute between the parties or some metaphysical doubt as to the material facts, is sufficient to oppose a motion for summary judgment." *Robin*, 200 F.3d at 1088 (citations omitted); *see also Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) ("To show pretext, [a plaintiff] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence."). Hernandez has not presented evidence from which a reasonable jury could find that there was no basis in fact for the propositions

that students and employees complained about him or that those complaints were a reason for his termination.

Even if the Court confines its analysis to Hernandez's allegedly poor communication, the reason Spiwak that wrote on Hernandez's notice of termination, Hernandez has not shown the existence of a genuine issue of fact on this point. Spiwak's April 15, 2008 e-mail shows that he informed Hernandez of complaints about his communication style well over a month before his termination. Given that this warning followed several blunt and confrontational e-mails from Hernandez, the text and sending of which are undisputed, no reasonable jury could find that Spiwak's reasoning had no basis in fact or was not truly a reason for his termination.

Moreover, no reasonable jury could find Harper's reasons, taken together, "insufficient to warrant the discharge." *See Smeigh*, 643 F.3d at 561. This is particularly true because a court does not evaluate an employer's business judgment or the wisdom of a termination decision, but rather "only [assures] that such decisions are not intended to provide cover for illegal discrimination." *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946-47 (7th Cir. 2006). A showing that an "employer overreacted to [an employee's] behavior" is not the same as showing that the employer "fired her under false pretenses." *Fane*, 480 F.3d at 541. Hernandez has not provided evidence from which a reasonable jury could find false pretenses here.

Harper's final reason for termination concerns Hernandez's coaching philosophy. Harper contends that Hernandez focused excessively on recruiting an elite team to the detriment of his students' experience. Hernandez responds that his coaching philosophy was apparent before his hiring; it did not change during his employment;

and many students responded well to his coaching.  Were this Harper's only stated reason for termination, it arguably would not be entitled to summary judgment.  The Seventh Circuit has stated, however, that "when a defendant has offered multiple nondiscriminatory reasons for its hiring decision, showing that one of these reasons is pretextual is not enough."  *Bodenstab v. County of Cook*, 569 F.3d 651, 659 (7th Cir. 2009) (internal quotations and citation omitted).  That is not a universal rule; the court in *Bodenstab* noted that "there may be circumstances where multiple grounds offered by the defendant are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment."  *Id*. at 659 (internal quotations omitted).  But this is not one of those situations.

Hernandez has not provided evidence from which a reasonable jury could find that any of Harper's other reasons for his termination had no basis in fact.  Nor has he provided evidence from which a reasonable jury could find that Harper's proffered reasons "did not actually motivate the decision to terminate employment."  *Radentz v. Marion County*, 640 F.3d 754, 757 (7th Cir. 2011).  For these reasons, the Court grants Harper's motion for summary judgment on count 1.

## II.      Retaliation claims

### A.      Exhaustion of administrative remedies

Harper alleges that Hernandez failed to exhaust his administrative remedies with regard to his retaliation claim.  Title VII requires a plaintiff to file a charge with the EEOC within 180 days of an unlawful employment practice, or within 300 days if the plaintiff initiates proceedings with a state agency, as Hernandez did.  42 U.S.C. §

2000e-5(e)(1); *Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707 (7th Cir. 2002).

Harper argues that the retaliation claim, which Hernandez did not add until more than

300 days after his termination, amounted to an entirely new theory of recovery and was

therefore time-barred.  Hernandez counters that he only "amended [the charge] to

clarify and amplify allegations made therein," as permitted by 29 C.F.R. § 1601.12.  He

claims that his original charge had "stated a claim of retaliation by stating, 'I protested

[and] as a result' I was terminated," and that Harper was therefore "on notice" that he

was claiming that this complaint had led to his termination.  Pl.'s Repl. at 5.

The Seventh Circuit has held that "EEOC charges are to be read broadly."

*Kristufek v. Hussmann Foodservice Co.*, 985 F.2d 364, 368 (7th Cir. 1993).  "[A]

complaint may properly encompass any discrimination like or reasonably related and

growing out of charges filed with the EEOC.  What boxes, for instance, are checked on

the EEOC form do not necessarily control the scope of a subsequent civil complaint."

*Id*.  In *Kristufek*, the plaintiff filed an EEOC charge for age discrimination.  He then filed

in district court alleging age discrimination and retaliation based on the fact that he was

fired after arguing with his supervisor on behalf of a co-plaintiff who had also

complained of age discrimination.  The court allowed the retaliation claim to proceed,

finding the charges to be "related in time and substance and both focused on [the]

conduct" of the supervisor.  *Id*.  "That should have been enough even in a perfunctory

investigation of the charges to have revealed the retaliation aspect as part of the

whole."  *Id*.

By contrast, the Seventh Circuit concluded in *Fairchild v. Forma Scientific, Inc.*,

147 F.3d 567, 575 (7th Cir. 1998), that the plaintiff's charge of disability discrimination did not relate to or grow out of an age-discrimination charge. The court noted that if the plaintiff had "alleged facts that supported both claims, we may be more sympathetic," but that "he made factual allegations that could only support one kind of discrimination." *Id*. (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970) ("In the context of a statute like Title VII it is inconceivable that a charging party's rights should be cut off merely because he fails to articulate correctly the legal conclusion emanating from his factual allegations.")). Similarly, the court concluded in *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544 (7th Cir. 1988), that retaliation claims did not fall within the scope of an age-discrimination complaint because the EEOC charge did not include any "mention of retaliation or any other words to that effect."

Unlike the plaintiffs in *Fairchild* and *Steffen*, Hernandez's statement that he "protested, as a result . . . I was terminated" constituted an allegation of facts that supported a claim of retaliation. His original charge referenced his termination, and it stated that it came "as a result" of his protest. As in *Kristufek*, a "perfunctory investigation" easily would have indicated to Harper that Hernandez's "protest" was a protected complaint, because his April 9, 2008 e-mail clearly references a "racialist justification" and "discrimination." *See O'Leary v. Accretive Health, Inc.*, _ F.3d _, No. 10 C 1418, 2011 WL 4375684, at *5 (7th Cir. Sept. 21, 2011) (protected activity by a retaliation plaintiff is "some step in opposition to a form of discrimination that the statute prohibits."). Hernandez's amended charge did not refer to any new facts or incidents. He should not be penalized for failing to identify the proper legal theory.

For these reasons, the Court concludes that Hernandez's retaliation claim was sufficiently related to his discrimination claim to constitute a permissible amendment and thus that the claim is not time-barred.

**B.     Evidence of retaliation**

Hernandez argues that Harper terminated him in retaliation for his complaint about Harper's request for his fingerprints.  He argues this claim under the direct method of proof.  This requires him to show that he engaged in protected expression, that he suffered an adverse employment action, and that there was a connection between the two.  *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005).  There is no dispute that Hernandez engaged in a protected expression or that he suffered an adverse employment action.

Hernandez has offered no evidence, however, from which a reasonable jury could find a causal connection between his complaint and his termination.  His primary argument is based on timing:  he claims that Spiwak did not inform him of any complaints about him until after his e-mail protest, and that the alleged complaints and firing took place so soon after this protest that they lead to an inference of causation. The Court disagrees.  Although timing alone can sometimes support an inference of causation sufficient to defeat summary judgment, the seven-week interval at issue here does not do so, at least without other corroborative evidence.  *See Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("The approximate seven-week interval . . . does not represent that rare case where suspicious timing, without more, will carry the day.").

The Court concludes that Hernandez has failed to show that there is a genuine issue of material fact regarding retaliation. It therefore grants Harper's motion for summary judgment on count 2.

**Conclusion**

For the reasons stated above, the Court grants defendant's motion for summary judgment [docket no. 27] and directs the Clerk to enter judgment in favor of defendant.

MATTHEW F. KENNELLY
United States District Judge

Date:  October 27, 2011